

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### AP-75,119
---

### TAICHIN PREYOR, Appellant

### v.

### THE STATE OF TEXAS

---
### ON DIRECT APPEAL
### FROM CAUSE NO. 2004-CR-3602 IN THE 290TH DISTRICT COURT
### BEXAR COUNTY
---

**PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and WOMACK, JOHNSON, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. MEYERS, J., did not participate.**

### O P I N I O N

The appellant was convicted in March 2005, of capital murder.[1] Based on the jury's

answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071,

sections 2(b) and 2(e),[2] the trial judge sentenced the appellant to death.[3] Direct appeal to this

---

[1] TEX. PENAL CODE § 19.03(a).

[2] Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal

Court is automatic.[4]  After reviewing the appellant's six points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

STATEMENT OF FACTS

The evidence showed that the appellant, also known as "Box," murdered Jami Tackett in the course of committing or attempting to commit burglary of a habitation on February 26, 2004.  The appellant was friends with Tackett, who sold drugs and kept cocaine in a safe in her apartment.  The appellant called Tackett earlier in the evening and said he was coming over to her apartment that night.  Tackett and some friends, including Jason Garza, partied at her apartment into the early morning hours.  The last guest left at about 4:00 a.m., at which point Tackett and Garza locked the front door, turned out the lights, and went to bed.  Shortly thereafter, the appellant, who was dressed from head to toe in black clothing, broke through the front door and entered Tackett's bedroom.  Tackett asked, "Box, what the hell are you doing here?"  The appellant said, "Fuck this," then jumped on the bed and began attacking Garza.  The appellant stabbed Garza, who managed to run away and asked neighbors to call for help, leaving Tackett alone with the appellant.  The appellant then stabbed Tackett numerous times and slashed her throat, severing her trachea, jugular vein, and carotid artery.  The appellant initially tried to leave the scene in his car, which was parked downstairs, but

Procedure.

[3]  Art. 37.071, § 2(g).

[4]  Art. 37.071, § 2(h).

he went back into Tackett's apartment, where he apparently searched for his car keys while Tackett struggled to breathe on her living-room floor. He encountered the police when he went back downstairs, and he failed to comply when they ordered him to stop and get on the ground. The officers struggled to handcuff the appellant, who was covered in blood, and used pepper spray to subdue him. Tackett died before the paramedics arrived. Police discovered a loaded shotgun on the bumper of the appellant's car and a knife and gloves in the grass nearby.

The State introduced evidence at the punishment phase that the appellant had committed a prior drug offense in Syracuse, New York, in 1999. Syracuse Police Officer Tim Laun testified that he had noticed the appellant and another man acting suspiciously at 2:00 a.m. He did a pat-down search of the appellant and discovered that he had a bag containing nearly four ounces of crack cocaine.[5] The appellant fled, and another officer later tackled and handcuffed him. The appellant pleaded guilty to possession of a controlled substance in exchange for a one-year sentence. A charge of resisting arrest was dismissed as part of his plea bargain. He told his probation officer that he had used cocaine since adolescence, and that he had started using it consistently in 1998, when he had an affair with a woman who was a drug abuser.

The appellant also told his probation officer that the crack cocaine was for his own personal use. However, when he was interviewed by clinical psychologist Dr. Joanne

---

[5] Laun testified that this amount of crack cocaine would sell for approximately $10,000.

Murphy prior to his capital-murder trial, he acknowledged that he had been selling drugs.

After serving time for his drug offense, the appellant moved to San Antonio, where he was joined by his wife and children. About one month before the instant offense, on January 14, 2004, the police went to the appellant's apartment on a "family violence call." The appellant was angry that police were there, and he was pacing, yelling, and screaming. He calmed down when his brother, a San Antonio police officer, arrived. His wife, who was "very pregnant" with their fourth child, did not appear to be injured and stated that she did not need assistance.

The appellant committed the following disciplinary infractions while in the Bexar County Jail awaiting trial: (1) possessing ten tablets of Tylenol, instead of the two tablets permitted; (2) disobeying an order from staff; and, (3) engaging in "loud, boisterous behavior or communication with other inmates" by lifting the lid on his cell door. The evidence also showed that the appellant had the dates of his drug offense and the instant capital murder tattooed on his body. He told Dr. Murphy that the tattoos were to remind him of mistakes that he never wanted to repeat.

GUILT/INNOCENCE POINTS OF ERROR

In his first point of error, the appellant contends that the trial court erred in overruling his *Batson* challenge to the State's peremptory challenge of prospective juror April Keisha Layne.[6] A defendant objecting under *Batson* must make a *prima facie* showing of racial

---

[6] *Batson v. Kentucky,* 476 U.S. 79 (1986).

discrimination in the State's exercise of its peremptory strikes.[7] The burden then shifts to the State to articulate race-neutral explanations for its strikes.[8] Once the prosecutor has articulated race-neutral explanations, the burden shifts back to the defendant to show that the explanations are really a pretext for discrimination.[9] The trial court must then determine whether the defendant has carried his burden of proving discrimination.[10] The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous.[11]

The appellant objected to the State's peremptory strike against Layne under *Batson.* Without making a finding that the appellant had made a *prima facie* case, the trial court entertained the State's explanations for the strike:

> THE COURT: . . . So, you want to tell me why you struck Ms. Layne, who happens to be a black woman?
>
> [PROSECUTOR]: Yes. Judge, I'm happy to tell you but I think first there has to be a pattern. There's certainly no pattern that we are striking all Blacks off the panel. I have her rated actually fairly low based on her answers on the questionnaire. I have a concern still with her stepbrother having been

---

[7] *Herron v. State,* 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); *Mathis v. State,* 67 S.W.3d 918, 924 (Tex. Crim. App. 2002).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

accused of a felony. She indicates in her questionnaire that she had gone with him to an attorney to discuss the case with the attorney, but at this point she's not being real forthcoming on what the felony actually was. Her questions in this case, also, when she was responding to the first question.

And I asked her if she thought that the capital murder itself, whether that could certainly prove the first special issue to her depending on the facts. She seems to have a real hangup with that. That caused me concern that she couldn't envision that sort of case where that first question could be answered simply by - - you know, by her hearing the evidence in the first part of the case. So, all of those things together have made me believe she is an appropriate strike for the State in this case.

When questioned further by defense counsel, the prosecutor also explained:

Q.     How are her answers different from the other - - With respect to every question that you feel upset about, how does her answer differ from the answers of other jurors which you have found acceptable?

A.     Most of the other jurors have not had a problem with answering the first special issue yes or not hesitated like she did in answering [the] special issue yes, based on the facts of the offense.

Q.     What were the specific words that caused you pause when she said yes?

A.     I believe she hesitated for a couple of seconds and said, you're really going to have to show me something. It's hard to explain exactly the words, but it was clear that she made quite a pause and seemed to indicate that we were going to have to bring her something more than the facts itself.

Q.     Now, she doesn't say that, does she, specifically?

A.     I don't remember her exact words, but it was clear to me that's what she meant.

After questioning the prosecutor, defense counsel stated, "Your Honor, I do not believe that the State has given a racially neutral reason and carried the burden of persuasion on this. I

move to go ahead and seat Ms. Layne." The trial court responded, "Well, I'll take [the prosecutor] at his word that he didn't factor race into his decision to use a strike on this woman. So, you may tell her that she can go."

The State's facially race-neutral explanations for striking Layne are supported by the record. When the prosecutor questioned Layne about her stepbrother, she stated, "I think it was like a drug case," and, "I can't tell you like details." When the prosecutor asked her if "just a capital murder itself could give [her] the answer" to the future dangerousness special issue, she replied, "It could, but you would need to really listen to the case." Although we cannot determine from the record how long Layne paused before answering that question, we defer to the trial court's acceptance of the State's explanation. The appellant did not show that the State's explanation was really a pretext for discrimination. The trial court did not abuse its discretion in denying the appellant's *Batson* challenge. Point of error one is overruled.

In point of error two, the appellant complains that the trial court erroneously admitted State's Exhibits 125 and 126, in violation of Rule 403 of the Texas Rules of Evidence. He argues that these autopsy photographs "were extremely gruesome and detailed," that they were cumulative, and that their probative value was substantially outweighed by the danger of unfair prejudice.

Rule 403 requires that a photograph have some probative value and that its probative

value not be substantially outweighed by its inflammatory nature.[12]  A court may consider

many factors in determining whether the probative value of photographs is substantially

outweighed by the danger of unfair prejudice.  These factors include:  the number of exhibits

offered, their gruesomeness, their detail, their size, whether they are in color or black-and-

white, whether they are close-up, whether the body depicted is clothed or naked, the

availability of other means of proof, and other circumstances unique to the individual case.[13]

The admissibility of photographs over an objection is within the sound discretion of the trial

judge.[14]  Autopsy photographs are generally admissible unless they depict mutilation of the

victim caused by the autopsy itself.[15]

State's Exhibits 125 and 126 appear in the record as color photographs that are

slightly larger than 5" by 7" in size.  They offer close-up views of open incised wounds to

the victim's neck and near her ear.  When the appellant objected to the admission of these

photographs, the prosecutor responded that State's Exhibit 125 showed "injuries to the ear

that are not apparent on other photos" and that State's Exhibit 126 "assists in showing the

pathway of the injury."  The trial court replied:

---

[12]
   TEX. R. EVID. 403; *Long v. State,* 823 S.W.2d 259, 272 (Tex. Crim. App. 1991).

[13]
   *Long*, 823 S.W.2d at 272;  *Santellan v. State,* 939 S.W.2d 155, 172 (Tex. Crim. App. 1997).

[14]
   *Sonnier v. State,* 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

[15]
   *Santellan,* 939 S.W.2d at 172; *Burdine v. State,* 719 S.W.2d 309, 316 (Tex. Crim. App. 1986).

THE COURT: Well, it seems that you have others that do the same thing - - 122, 124. I don't see how they are particularly different. No, this is the ear, 126.

[PROSECUTOR]: Specifically, Judge, if you would look at where the wounds end near the ear in 125 as opposed to 124 and 122, that's the significance.

THE COURT: Pick one.

[PROSECUTOR]: Between the three, Your Honor, because 122 also shows chest wounds that are not shown in the others. Your Honor, then between the three, 125 is the one that we would submit.

THE COURT: All right. Well, I'm going to overrule your objections to 125 and 126 and receive those into evidence, and 124 and 122 are pretty much the same thing, so those are not coming in. The rest are admitted.

The trial court did not abuse its discretion in admitting the photographs. Although the photographs depict the bloody stab wounds suffered by the victim, they portray no more than the gruesomeness of the injuries inflicted.[16] They were not cumulative, despite the fact that some of the other admitted photographs also showed the injuries to the victim's neck and near her ear. The wounds in the other admitted photographs were glued closed so that the medical examiner could better see their pathway or pattern and could better determine if the edges of the wounds were "pointed or blunted." Finally, the danger of unfair prejudice did not substantially outweigh their probative value. The photographs were relevant and probative to the jury's understanding of the victim's injuries. Point of error two is overruled.

PUNISHMENT POINTS OF ERROR

---

[16]

*Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992).

In point of error three, the appellant argues that the evidence is legally insufficient to support the jury's affirmative finding on the "future dangerousness" special issue. We view the evidence in the light most favorable to the jury's finding and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society.[17] The facts of the offense, alone, can be sufficient to support an affirmative answer to the special issue.[18]

The appellant argues on appeal that "the psychological testimony was favorable" and indicated that he would not be a future danger in prison. However, Dr. Murphy acknowledged on cross-examination that she did not consider the circumstances of the instant case and instead relied upon the appellant's school records and what the appellant and his attorney reported to her. The appellant argues that the jail records and the testimony of jail personnel showed that the appellant was "not a problem inmate." But the evidence showed that the appellant twice resisted arrest and had an angry reaction when police came to his home on a family-violence call. Further, Bexar County Sheriff's Deputy Mike Alvarado testified that, about a week prior to trial, a prison guard searched the appellant's cell for "non-privileged mail" and the "Special Response Team" (or "SERT team") was dispatched to assist in the matter. Alvarado acknowledged on cross-examination that "there had been

[17] *Jackson v. Virginia,* 443 U.S. 307 (1979).

[18] *Allridge v. State,* 850 S.W.2d 471, 488 (Tex. Crim. App. 1991).

sort of an escalation" before the "SERT team" was called and that "there was a lot of tension."

The appellant brutally murdered Tackett and seriously wounded Garza. The way in which he killed Tackett, by stabbing her multiple times and slitting her throat, was particularly violent. The circumstantial evidence indicated that the offense was premeditated. Further, the appellant resisted the police when they tried to arrest him, as he had done at another time in the past. The evidence, viewed in the light most favorable to the jury's finding, was such that any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. Point of error three is overruled.

In his fourth point of error, the appellant challenges the admission of "his 1999 drug conviction and related resisting arrest charge" at the punishment phase. He asserts that the conviction and charge "were clearly the result of a Fourth Amendment violation" because the officers did not have reasonable suspicion to stop and search him.

The trial court has wide latitude in admitting or excluding evidence of extraneous offenses at the punishment stage of a capital trial.[19] The trial court has the discretion to admit any evidence relevant to the jury's determination of a capital defendant's deathworthiness, including evidence of adjudicated or unadjudicated extraneous offenses.[20] The State's

---

[19]
Art. 37.071, § 2(a); *Hughes v. State,* 24 S.W.3d 833, 843 (Tex. Crim. App. 2000).

[20]
*Id.; Powell v. State,* 898 S.W.2d 821, 830 (Tex. Crim. App. 1994).

burden is to "clearly prove" that the extraneous offense was committed and that the appellant was the perpetrator.[21] Here, by introducing the judgment of conviction and presenting the testimony of police officers, the State clearly proved that the appellant possessed a controlled substance and resisted arrest in New York in 1999. Now the appellant makes an impermissible collateral attack upon that prior conviction.[22] Point of error four is overruled.

In point of error five, the appellant claims that the trial court erroneously denied his request "to not instruct the jury that mitigating evidence is evidence that reduces the appellant's moral blameworthiness." In point of error six, he argues that the trial court erroneously denied his request to instead define "mitigating evidence" as "any evidence that may serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and the commission of the crime."

Pursuant to Article 37.071, the trial court instructed the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[23] The appellant claims that this statutory definition is contrary to

---

[21] *Hughes,* 24 S.W.3d at 843; *cf. Hunter v. State,* No. AP-74,983, ___ S.W.3d ___ (Tex. Crim. App. November 7, 2007)(stating there is no error in not having a burden-of-proof instruction concerning extraneous offenses as long as the punishment charge properly requires the State to prove the special issues, other than mitigation and affirmative defenses, beyond a reasonable doubt).

[22] *See Stone v. Powell*, 428 U.S. 465, 493 (1976) ("[T]he additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs.").

[23] Art. 37.071, § 2(f).

the United States Supreme Court decisions in *Smith v. Texas,* 543 U.S. 37 (2004), and *Tennard v. Dretke,* 542 U.S. 274 (2004). He asserts that this definition "leads a reasonable juror to believe that the juror cannot consider evidence as mitigating unless it reduces the defendant's blame." He further alleges that this definition "also requires a nexus between the evidence and the circumstances of the offense since the definition requires the evidence to reduce the defendant's blame for the offense before it can be considered as mitigating."

We have decided this claim adversely to the appellant in previous cases.[24] In *Perry,* we specifically stated that the mitigation special issue does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness and that the Supreme Court's *Tennard* decision, which was decided under another statutory scheme that did not include the mitigation special issue, does not hold otherwise.[25] Points of error five and six are overruled.

We affirm the judgment of the trial court.

Delivered:    January 23, 2008
Do Not Publish

---

[24]

*Roberts v. State,* 220 S.W.3d 521, 534 (Tex. Crim. App.), *cert. denied,* 128 S. Ct. 282 (2007); *Perry v. State,* 158 S.W.3d 438, 449 (Tex. Crim. App. 2004), *cert. denied,* 546 U.S. 933 (2005).

[25]

*Id.*